UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| ARTHUR STEWART, <br><br> Plaintiff, <br><br> v. <br><br> OFFICER M. GALLAGHER #135, <br><br> Defendant. | CAUSE NO.: 2:21-CV-115-TLS |

**OPINION AND ORDER**

This lawsuit stems from the February 22, 2019 arrest of the Plaintiff Arthur Stewart by the Defendant Officer M. Gallagher, a police officer with the City of Hobart Police Department, during the course of an investigatory stop of two railroad employees following a report of gunshots fired in the area. The Plaintiff filed a one-count Complaint under 42 U.S.C. § 1983, alleging a constitutional claim of excessive force against the Defendant. This matter is now before the Court on the Defendant's Motion for Summary Judgment [ECF No. 21]. Because there are questions of material fact for the jury, the Court denies the motion.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every

element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the Court views the facts in the light most favorable to the Plaintiff, the non-movant, the Court also includes the material differences between the parties' versions of the events. *See Abbott v. Sangamon County*, 705 F.3d 706, 709 (7th Cir. 2013).

**MATERIAL FACTS**

The Defendant Michael Gallagher is a detective with the Hobart Police Department. Def. Ex. A, 3:6–14, ECF No. 23-1. During the evening hours of February 22, 2019, he heard over radio dispatch a report of gun shots fired near Liverpool Road and 61st Avenue. *Id.* at 25:11–26:10. Because he was patrolling in that area, he responded to the call. *Id.* at 26:5–11. As he approached the area, he was waved over by a female witness who said that, after the shots were fired, she saw a "weird-looking" truck fleeing the area heading east on 61st Avenue. *Id.* at 10–14. He drove east on 61st Avenue to Colorado Street and turned south on Colorado until he reached the railroad crossing north of 69th Avenue. *Id.* at 27:3–9; Def. Ex. B, ¶ 3, ECF No. 23-3.

There the Defendant observed a Dodge Charger parked in front of a small railway bungalow, with its back end facing the shed; it bore no railroad insignia or marking of any kind. Def. Ex. A, 27:8–10; Def. Ex. B, ¶ 3. Thinking this to be odd, the Defendant got out of his patrol vehicle and inspected the license plate, calling in the number to the dispatcher. Def. Ex. A, 27:10–12. The dispatcher reported back that the vehicle's owner had prior weapons offenses. *Id.* at 27:12–13. A CN Railroad truck then pulled up next to the Defendant's patrol car. *Id.* at 29:8–10. To the Defendant, the vehicle fit the description of a "weird-looking" truck because it had metal wheels for driving on railroad tracks. *Id.* at 29:10–12, 30:24–31:6.

The Defendant approached the truck and began to speak to the driver, explaining that he was investigating a report of gunshots fired in the area and asking to whom the Dodge Charger belonged. *Id.* at 29:12–15; Def. Ex. C, 34:11–24, ECF No. 23-4. The Plaintiff was seated next to the driver. Def. Ex. A, 29:12–15, 17–19; Def. Ex. B, ¶ 5; Def. Ex. C, 34:14–20. The Plaintiff and the driver told the Defendant that the Charger belong to the Plaintiff. Def. Ex. C, 34:22. From this point, the parties' versions of the events diverge.

According to the Plaintiff, the Defendant returned to his police vehicle. Pl. Ex. 1, 35:22–23, ECF No. 30-2. The Defendant did not tell the Plaintiff to stay in the truck. *Id.* at 36:2–4. Because it was getting late, the Plaintiff took his belongings out of the CN Railroad truck and went to his Dodge Charger to leave. *Id.* at 36:6–11, 37:20–21. As the Plaintiff was placing his belongings in his car, the Defendant approached him. *Id.* at 37:21–24. As the Defendant approached, he said, "Do you mind placing your hands on top of your vehicle for me[?]" *Id.* at 39:22–40:8. The Plaintiff complied by placing his hands on top of his vehicle, and the Defendant searched him for weapons. *Id.* at 40:7–21. The Plaintiff spoke to the Defendant in a regular tone and was calm, not disturbed or angry. *Id.* at 42:12–20. After the pat down, the Defendant asked

the Plaintiff to provide identification to verify that he worked for the railroad. *Id.* at 42:3–6. The Plaintiff produced his driver's license. *Id.* at 43:1–5. Although the Plaintiff questioned the Defendant as to why he needed the Plaintiff's identification, at no time did the Plaintiff clench his fists while speaking with the Defendant about his identification nor did he move but remained standing in front of the car door. *Id.* at 51:7–11, 54:9–13. The Plaintiff did not raise his voice, but the tone of his voice changed once he was asked for identification. *Id.* at 42:22–25.

After obtaining the Plaintiff's license, the Defendant began to walk back toward his patrol car but stopped somewhere in between. *Id.* at 62:21–63:1. The Defendant then returned to the Plaintiff and ordered him to place his hands back on the roof of the Dodge Charger. *Id.* at 63:2–4, 18–23. At this time, Hobart Police Officer Alexandra Meier arrived on scene. Def. Ex. D, ¶¶ 1–3, ECF No. 23-5. The Defendant told the Plaintiff to put his hands behind his back to place him in handcuffs. Pl. Ex. 1, 63:5–18, 64:2–6. The Plaintiff began to comply, placing his right hand behind his back, and at the same time asked why he was being handcuffed. *Id.* at 64:13–23, 65:9–16. The Plaintiff did not move but may have turned his head while asking why he was being handcuffed. *Id.* at 65:20–24. Then, while handcuffing him, the Defendant picked up the Plaintiff and slammed him to the ground before trying to get the other arm in the handcuff. *Id.* at 68:2–24. After being slammed to the ground, the Plaintiff got to his knees; then the Defendant started choking him. *Id.* at 70:5–6. The Plaintiff did not struggle with the Defendant. *Id.* at 72:11–16. Officer Meier had the Plaintiff's right hand behind the Plaintiff's back, and the officers put the Plaintiff in handcuffs. *Id.* at 72:2–22; Def. Ex. D, ¶ 7. Officer Meier took the Plaintiff into custody and transported him to the Hobart City Jail. Def. Ex. D, ¶ 8.

The Defendant tells a different version of the events. Returning in time to when the Defendant was initially speaking to the driver of the CN Railroad truck, the Defendant says that

4

the Plaintiff pulled up the hood of his garment, looked away from the Defendant, and exited the truck while the Defendant was still talking. Def. Ex. A, 29:12–22. The Plaintiff walked very quickly to the Dodge Charger, occasionally looking back in the Defendant's direction. *Id.* at 29:19–22. The Defendant describes this encounter as an investigatory stop. *Id.* at 29:23–30:5. The Defendant then walked toward the Plaintiff, again explaining what he was investigating, and asked the Plaintiff for identification. *Id.* at 31:19–32:1. The Plaintiff became defensive, asked the Defendant why he had not asked the driver for identification, cursed loudly at the Defendant, and accused the Defendant of stopping him because he was black. *Id.* at 32:1–4. At this point, the Defendant told the Plaintiff to put his hands on the Dodge Charger so he could conduct a pat down. *Id.* at 32:15–19. However, the Plaintiff did not fully comply; although the Plaintiff put his hands on top of the car, he kept moving his hands away and moving his body toward the Defendant while the Defendant was attempting to pat him down. *Id.* at 32:19–22, 33:14–23. Officer Meier, who had arrived at the scene, observed the Plaintiff turning around, yelling at the Defendant, and not holding still while the Defendant was ordering the Plaintiff to put his hands behind his back and remain still. Def. Ex. D, ¶ 4.

The Defendant states that, during their confrontation, the Plaintiff yelled at the Defendant to go and talk to the driver and leave the Plaintiff alone. Def. Ex. A, 33:24–34:5, 36:4–13. Because of the Plaintiff's constant movement, the Defendant felt that the pat down was not very thorough, which made him uneasy. *Id.* at 32:23–33:5, 38:19–23; Def. Ex. B, ¶ 9. The Defendant asked the Plaintiff whether he had a weapon on him, and the Plaintiff denied having any weapon; however, after the Plaintiff was later handcuffed, the Defendant found on the Plaintiff a multi-tool (like a Leatherman) that has a knife blade. Def. Ex. B, ¶¶ 9, 14; Ex. C, 40:22–41:16. The Plaintiff produced identification but then became even more irate. Def. Ex. A, 38:7–16. When

the Defendant went to his patrol car to run the identification, the Plaintiff followed the Defendant and continued to yell at him. Def. Ex. B, ¶ 10. The Plaintiff's fists were clenched, and the Defendant was concerned the Plaintiff was going to assault him. *Id.* The Defendant ordered the Plaintiff to put his hands behind his back for handcuffing, but the Plaintiff did not comply. Ex. A, 40:1–10; Ex. B, ¶ 11. Officer Meier also states that the Plaintiff did not comply with the order. Ex. D, ¶ 5.

At the time of the encounter, the Defendant stood 5'5" and weighed approximately 175 pounds. Def. Ex. B, ¶ 7. The Plaintiff stood 5'9" and weighed approximately 220 pounds. Def. Ex. C, 69:1–7. Fearing for his safety and believing the Plaintiff was about to strike him, the Defendant got behind the Plaintiff and pulled him to the ground. Def. Ex. A, 40:5–17; Def. Ex. B, ¶¶ 10–11. Plaintiff pushed up from the ground while the Defendant was on his back, lifting the Defendant off his feet. Def. Ex. A, 40:15–21; Def. Ex. B, ¶ 12. Officer Meier observed the Defendant attempting to place the Plaintiff on the ground, the Plaintiff resisting, and the Plaintiff pushing off the ground with the Defendant on his back. Def. Ex. D, ¶ 6. To gain control of the situation, the Defendant moved his left arm up against the Plaintiff's upraised left arm and brought his own right arm around to grasp his own left forearm, pushing his right arm against the right side of the Plaintiff's neck. Def. Ex. B, ¶ 12; Def. Ex. A, 40:20–22. This is a form of vascular neck restraint, a hold taught to the Defendant at the police academy for use when a suspect is physically resisting. Def. Ex. B, ¶ 13.[1] Officer Meier went to aid the Defendant by grabbing the Plaintiff's right wrist and pulling it toward his back; she then handcuffed the Plaintiff's right wrist. Def. Ex. D, ¶ 7. The Defendant handed Officer Meier the Plaintiff's left

---

[1] The Defendant has submitted evidence regarding the nature and use of a vascular neck restraint and that it is taught at the law enforcement academy. *See* Def. Exs. E, E-1, ECF Nos. 23-6, 23-7. However, because of the material facts in dispute regarding the altercation itself, the details of the training are not material to the instant motion.

6

arm, and she was able to handcuff the Plaintiff's left wrist, after which she took him into custody and drove him to the Hobart City Jail. *Id.* at ¶¶ 7–8.

## ANALYSIS

The Defendant seeks summary judgment in his favor on the Plaintiff's Fourth Amendment excessive force claim brought under 42 U.S.C. § 1983, arguing that he is entitled to qualified immunity because his use of force was objectively reasonable under the circumstances. The Plaintiff responds that there are genuine disputes of material fact that preclude the application of qualified immunity.

Section 1983 provides, in pertinent part, that "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must show that the defendant deprived him of a federal constitutional right and that the defendant acted under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006).

In this case, the federal constitutional right at issue is the Fourth Amendment right to be free from excessive force, which is governed by the objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021) (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012)). The totality of the circumstances considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight." *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham*, 490 U.S. at 396).

"An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest, . . . circumscribed by the Fourth Amendment's insistence on reasonableness." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (citing *Graham*, 490 U.S. at 396). "[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Thus, the reasonableness of the use of force must consider the facts "from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal quotation marks and citation omitted)). Importantly, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citation omitted).

Qualified immunity, which protects government officials from damages liability, "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)); *see also Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). The two questions for a court are whether the plaintiff has shown that the defendant "violated a constitutional right" and whether the constitutional right in question "was clearly established at the time of the alleged violation." *Fosnight v. Jones*, 41 F.4th 916, 924 (7th Cir. 2022) (quoting *Archer v. Chisholm*, 870 F.3d 603,

613 (7th Cir. 2017)). The questions may be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009). Once the defendant raises the defense, the plaintiff bears the burden of defeating it. *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021).

On the first element of qualified immunity, the Court finds that the Plaintiff has raised a genuine dispute of material fact on the issue of whether the Defendant's conduct constituted a deprivation of the Plaintiff's Fourth Amendment rights. The parties dispute the events that led to the Defendant slamming the Plaintiff to the ground, and it is not the Court's role to resolve this factual dispute on this motion. On the one hand, the Defendant contends that his use of force was objectively reasonable because he was confronted with a much larger individual acting in a suspicious, if not openly aggressive, manner, who would not allow a thorough pat down, would not willingly give up both hands, and had a history of weapons charges. He reasons that this plainly raises fears of safety on the part of an officer investigating gunshots fired in the area. He further contends that, with the situation escalating and concerns for his own safety, he only put his hands on the Plaintiff when the Plaintiff would not willingly give up both hands when ordered to do so. At that point, the Defendant says the Plaintiff resisted by raising himself up, causing the Defendant's feet to come off the ground. The Defendant then deployed a hold taught at the law enforcement academy, which temporarily put pressure on the Plaintiff's carotid artery and is an accepted law enforcement technique to gain a suspect's compliance. The Defendant argues that there are no facts to suggest he did not reasonably believe his use of force was warranted or that it violated clearly established law.

However, the Plaintiff's version of the events provides the necessary facts to raise such a question as to whether the force used by the Defendant to take the Plaintiff to the ground was objectively reasonable. By his sworn testimony, the Plaintiff states that at no point did he resist

9

or make any aggressive movements before the Defendant threw him to the ground without provocation. He states that he did not approach the Defendant aggressively or clench his fists. When the Defendant ordered the Plaintiff to place his hands on his vehicle, the Plaintiff cooperated by placing his hands on the vehicle and permitting the pat down. The Plaintiff then cooperated by providing his identification. The Plaintiff again cooperated by placing his hands on his vehicle a second time and then complied by putting his right hand behind his back to be handcuffed when asked by the Defendant. But when the Plaintiff questioned why he was being handcuffed, the Defendant slammed him to the ground despite the Plaintiff showing no signs of resisting. Thus, the Plaintiff states that it was not until after the Defendant used unlawful force by slamming him to the ground that he resisted by trying to stand up.

    In his reply brief, the Defendant contends that the Plaintiff does not dispute that he yelled at the Defendant to leave him alone and to go to talk to the driver instead; that he moved around constantly during the pat down, making it difficult for the Defendant to determine if he had a weapon on his person; or that, when the Defendant went to run the identification, the Plaintiff followed behind him and continued to berate him. However, the Plaintiff directly disputes each of these facts in his testimony. The Plaintiff testified that he did not raise his voice when questioning the request for identification, that he did not move around during the pat down except possibly by turning his head to ask why he was being asked for identification, and that he did not leave the side of his car or follow the Defendant. The Defendant also notes that the Plaintiff does not dispute that, when asked if he had a weapon on him, he denied having a weapon, but that later a "utility knife" was discovered on him. However, the Plaintiff testified it was a "muti-tool," like a Leatherman, that had a knife blade in it, which he had forgotten about, and that it was found in the utility pocket of his pants. Def. Ex. C, 40:20–41:16. Regardless, the

fact is not material to the question of whether Defendant taking the Plaintiff to the ground was a reasonable use of force because the multi-tool was not found until later.

Thus, there is a factual dispute as to whether the Plaintiff resisted prior to the Defendant taking him to the ground. *See Abbott*, 705 F.3d at 729. The facts viewed in the light most favorable to the Plaintiff are that he complied with all the Defendant's demands, including providing his identification and placing his right hand behind his back, before he was taken to the ground. Although the Plaintiff questioned why he was being asked for identification, he did not raise his voice, resist, or move away from his car. Under the totality of the circumstances, when the facts are viewed in the light most favorable to the Plaintiff, the Defendant slamming the Plaintiff to the ground could be determined by a jury to have been an unreasonable use of force. *See, e.g., id.* at 729–30.

Turning to the second element of qualified immunity, a constitutional right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 725 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "In other words, 'existing precedent must have placed the . . . constitutional question beyond debate.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Here, the law was clearly established at the time in 2019 that police officers cannot use significant force on suspects who are not resisting or are passively resisting. *See id.* at 732 (citing *Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003)).

The Plaintiff cites *Morfin v. City of East Chicago* as an example of a case establishing that the use of force on a suspect who is not resisting violates the Fourth Amendment. Mr. Morfin was a mechanic for the local election board, and he was called to a location where a voting machine was malfunctioning. *Morfin*, 34 F.3d at 992. When he arrived, he was met by

11

two officers. *Id*. He identified himself and checked the machines. *Id.* Having received a complaint that Mr. Morfin was interfering with the investigation, the officers grabbed Mr. Morfin, twisted his arm, shoved him against the wall, and took him to the floor. *Id.* at 993. Mr. Morfin had not resisted to that point. *Id.* Once he was on the floor, Mr. Morfin crossed his arms to his chest to prevent the officers from handcuffing him. *Id.* The Seventh Circuit Court of Appeals reversed the grant of summary judgment for the defendants, finding that there was a genuine dispute of material fact regarding Mr. Morfin's resistance. *Id*. at 1005. The court noted that, according to Mr. Morfin and another witness, "Mr. Morfin did not pose a threat to the officers—he was docile and cooperative." *Id.* The court reasoned, "It was only after the officers took Mr. Morfin to the floor that Mr. Morfin crossed his arms on his chest to prevent the officers from handcuffing him." *Id.* The court found that, "[i]f a jury were to credit Mr. Morfin's version of the events over that of the arresting officers, it could conclude that there was no reason for the officers to exert such force on Mr. Morfin." *Id*.

  In this case, if the Plaintiff's version of the facts is credited, the Plaintiff, like Mr. Morfin, did not resist until after the unprovoked use of excessive force by the Defendant when he slammed the Plaintiff to the ground. And even then, his resistance was standing up, at which time he was placed in a chokehold by the Defendant. Notably, the Defendant's reply brief does not address the Plaintiff's citation to *Morfin* or acknowledge that the challenged use of force is when the Defendant slammed the Plaintiff to the ground. Rather, the Defendant argues that the Plaintiff did not have a clearly established right to resist arrest, to contest the Defendant's orders, or to hinder the investigation. But, these arguments rely only on the Defendant's version of the facts without acknowledging the disputes of material fact arising from the Plaintiff's testimony. In addition, the Defendant focuses on his use of the tactical restraint after the Plaintiff started to

get up from the ground. When the facts are viewed in the light most favorable to the Plaintiff, the Plaintiff was neither resisting arrest, contesting the Defendant's orders, nor hindering the Defendant's investigation. Because it was clearly established at the time that an officer may not use significant force on a suspect not resisting arrest and because there are disputes of material fact regarding the circumstances preceding the Defendant clamming the Plaintiff to the ground, the Defendant is not entitled to qualified immunity on the record before the Court. As a result, the Court denies the Defendant's motion for summary judgment.

As a final matter, the Court addresses what appear to be challenges in the Plaintiff's response brief to whether the Defendant had reasonable suspicion for the investigatory stop, the pat down, and the request for identification. However, the Plaintiff has not alleged any claims related to the stop itself. And the Court does not understand the Plaintiff to be asserting any new separate claim based on the stop, the search, or the questioning but rather to be attempting to provide context for his excessive force claim. Thus, the Court disregards those arguments for purposes of the instant motion, focusing solely on whether there was an objectively reasonable basis for the Defendant's use of force.

## CONCLUSION

For the reasons set forth above, the Court hereby DENIES the Defendant's Motion for Summary Judgment [ECF No. 21]. This matter will be set for a scheduling conference by separate order.

SO ORDERED on February 16, 2023.

                                              s/ Theresa L. Springmann
                                              JUDGE THERESA L. SPRINGMANN
                                              UNITED STATES DISTRICT COURT